# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Jeffery Quist, as Trustee for the heirs and next of kin of Jerald Quist, deceased; and Virginia Quist,<br><br>                  Plaintiffs,<br><br>v.<br><br>Sunbeam Products, Inc., d/b/a Jarden Consumer Solutions,<br><br>                  Defendant. | Civil No. 08-5261 (DWF/AJB)<br><br><br><br>**MEMORANDUM**<br>**OPINION AND ORDER** |

---

George E. McLaughlin, Esq., McDermott Hansen & McLaughlin, LLP; Shawn M. Raiter, Esq., Larson King, LLP; and Joseph F. Lulic, Esq., Hanson Lulic & Krall, LLC, counsel for Plaintiffs.

George W. Soule, Esq., and William N.G. Barron, IV, Esq., Bowman & Brooke, LLP; and Stephen T. Moffett, Esq., and Thomas L. Vitu, Esq., Moffett, Vitu, Lascoe & Packus, PS, counsel for Defendant.

---

This matter is before the Court on a Motion for Partial Summary Judgment and two *Daubert* motions brought by Defendant Sunbeam Products, Inc., d/b/a Jarden Consumer Solutions ("Sunbeam"). The case arises out of a tragic fire that occurred in the home of Plaintiff Virginia Quist on February 7, 2008. In the Complaint (Doc. No. 1), Jeffery Quist, as Trustee for the heirs and next of kin of Jerald Quist, Deceased, and Virginia Quist (collectively, "Plaintiffs") raise claims for strict liability, negligence,

breach of express warranty, breach of implied warranty of merchantability, violation of consumer protection statutes, and wrongful death. Plaintiffs allege that the fire was caused by an electric heating pad manufactured by Sunbeam. Sunbeam moves for partial summary judgment on Plaintiffs' request for property damage and the failure to warn claim.[1] For the reasons set forth below, Sunbeam's motion is granted in part and denied in part.

## BACKGROUND

On February 7, 2008, a fire broke out in the home of Virginia and Jerald Quist in Richfield, Minnesota, while Virginia Quist was lying on a couch in the den of the home. Ms. Quist exited the home with some injuries, but Jerald Quist was unable to escape and died as a result of smoke inhalation from the fire.

Ms. Quist asserts that prior to the fire, she had placed a Sunbeam Ultraheat Heating Pad (the "Sunbeam Heating Pad") across her stomach, as she often did, while watching television. Ms. Quist contends that at approximately 10:00 p.m. that night, she moved the Sunbeam Heating Pad to the backrest of the couch near her feet and fell asleep. Ms. Quist awoke to the sound of the smoke detector and saw flames on the couch near where the Sunbeam Heating Pad laid. Ms. Quist asserts that she attempted unsuccessfully to extinguish the fire with a pillow and then ran to alert her husband who

---

[1] Sunbeam initially moved for partial summary judgment regarding Plaintiffs' claims for express warranty, implied warranty of merchantability, and violation of consumer protection statutes, as well. Pursuant to Plaintiffs' briefing and representations at oral argument on the matter, Plaintiffs have conceded those claims. In addition, Plaintiffs have acknowledged that they never made a claim for negligent infliction of emotional distress. (Pls.' Mem. at 1.)

was sleeping in the nearby master bedroom. Then, Ms. Quist called 9-1-1 and exited the house, assuming that her husband was following her out. However, it appears that Jerald Quist was unable to attach his prosthetic leg and later was found lying on the bed in the master bedroom with his prosthetic leg beside him. Ms. Quist suffered third degree burns on her right wrist and left ankle as a result of the fire.

## DISCUSSION

### I.   Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Property Damage

Sunbeam moves for summary judgment on Plaintiffs' claim for property damage caused by the fire, arguing that Plaintiffs may no longer pursue such damages after having been fully compensated for them by the insurer, Auto Owners Insurance Company ("Auto Owners"). The Quists' property had a fire coverage policy provided by Auto Owners. Pursuant to this Policy, Ms. Quist claimed damage to her dwelling in the amount of $167,490.57, personal property damage of $67,709.73, and additional living expenses of $7,000, for a total of $242,200.30. Auto Owners paid Ms. Quist $243,115.21 on this claim. Auto Owners did not subtract a deductible from its payments to Ms. Quist, even though it appears that the Policy provided for a deductible.

"If the loss of an insured is fully covered by insurance and the insurer has compensated insured for the loss, the insurer is subrogated to any rights insured may have had against a third party because of the loss. In such case, the insurer is the real party in interest and must bring suit in its own name under the real-party-in-interest statute." *Blair v. Espeland*, 43 N.W.2d 274, 276 (Minn. 1950). If the insured would retain "some interest in the cause of action," suit may be brought in the insured's name. *Id*. But here, Plaintiffs did not even pay the deductible. Accordingly, because Plaintiffs have retained "no portion" of their claim, Auto Owners, as insurer, "is the real party in interest, and the action must be brought in its name." *Id*. *Accord* 6A Charles Alan Wright, et al., Federal Practice and Procedure § 1546 (2d ed. 1990) ("The general rule in the federal courts is

4

that if the insurer has paid the entire claim, it is the real party in interest and must sue in its own name.").

Nevertheless, Plaintiffs contend that under Federal Rule of Civil Procedure 17(a)(1)(G), they may seek recovery of such damages because Minnesota's fire insurance statute, Minn. Stat. § 65A.01, authorizes her claim. Rule 17(a), which generally provides that an action must be prosecuted in the name of the real party in interest, also provides that "a party authorized by statute" may sue in its own name "without joining the person for whose benefit the action is brought." Fed. R. Civ. P. 17(a)(1)(G). Plaintiffs then contend that Section 65A.01 authorizes their suit.

Section 65A.01 does not authorize suit by an insured under such circumstances. To the contrary, it simply reiterates, as part of the standard fire insurance policy required by Minnesota law, the basic principle of subrogation, that is, that the insurer "is subrogated to, and may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefore is made by [the insurer]; and the insurer may prosecute therefore in the name of the insured retaining such amount as the insurer has paid." Minn. Stat. § 65A.01, subd. 3. Plaintiffs' reliance on *Independent School District No. 14 v. Ampro Corp.* is unpersuasive in this regard because there, the court expressly noted that the insurer had not paid for the entire loss, as the insured was subject to a deductible. 361 N.W.2d 138, 141 (Minn. App. 1985), *pet. for rev. denied* (Minn. 1985).

Finally, Plaintiffs assert that pursuant to an agreement Ms. Quist entered into with Auto Owners, she would be the sole plaintiff seeking to recover for her property loss,

5

with the costs of suit split between insurer and its insured. Plaintiffs have submitted a letter dated August 21, 2009, purporting to memorialize that agreement. (Lampi Aff. Ex. A.) Sunbeam contends, however, that this agreement "was never produced to Sunbeam during discovery." (Def.'s Reply Mem. at 6 n.1.) Thus, Sunbeam asserts that Auto Owners should litigate this case on its own behalf to recover the property damages that it paid to Ms. Quist.

The Court finds that summary judgment is not warranted on Plaintiffs' property damage claim. Absent any agreement (Lampi Aff. Ex. A), the Court would have found in Sunbeam's favor on this issue—that Auto Owners, not Plaintiffs, should seek to recover the property damages that Auto Owners paid to Plaintiffs. However, the evidence of the contractual agreement provided by Plaintiffs is enough to preclude summary judgment on this issue. Although Sunbeam has asserted that this agreement is not properly before the Court because it was not produced during discovery, the Court has no evidence that Sunbeam asked for such information and that Plaintiffs failed to provide it. Accordingly, the Court denies summary judgment on this issue.

### III. Failure to Warn

Sunbeam moves for summary judgment on Plaintiffs' failure-to-warn claim, asserting that no evidence exists to support Plaintiffs' claim that Sunbeam failed to warn them of the risks known to Sunbeam of the dangers associated with using the product. Specifically, Sunbeam contends that Plaintiffs have failed to provide expert opinions on this issue.

Under Minnesota law, to establish a failure-to-warn claim, a plaintiff must demonstrate that "(1) the defendants had reason to know of the dangers of using the product; (2) the warnings fell short of those reasonably required, breaching the duty of care; and (3) the lack of an adequate warning caused the plaintiff's injuries." *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 924 (8th Cir. 2004) (citing *Erickson v. Am. Honda Motor Co.*, 455 N.W.2d 74, 77-78 (Minn. Ct. App. 1990) (quotations omitted).

Sunbeam asserts that expert testimony on the Sunbeam heating pad is necessary because the heating pad is a complex product and the determination as to how Plaintiffs would have reacted to a different warning is a matter beyond the expertise of lay jurors. Sunbeam also challenges Plaintiffs' assertion that Sunbeam owed Plaintiffs a post-sale duty to warn about reports of its products causing fires.

Under Minnesota law, a manufacturer has a duty to warn the users of its products of all dangers that are associated with those products of which it has actual or constructive knowledge. *Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 739 (Minn. 1980); *Harmon Contract Glazing, Inc. v. Libby-Owens-Ford Co.*, 493 N.W.2d 146, 151 (Minn. Ct. App. 1992). "Failure to provide such warnings will render the product unreasonably dangerous and will subject the manufacturer to liability for damages under strict liability in tort." *Gryc,* 297 N.W.2d at 739 (quotation omitted). The question of whether a duty to warn exists is a question of law for the Court. *Harmon*, 493 N.W.2d at 151. "The necessity of expert testimony in a failure to warn case turns on the complexity of the subject matter." *Menz v. New Holland North America, Inc.*, 507 F.3d 1107, 1111 (8th Cir. 2007).

The Court finds that here, the technology of the Sunbeam heating pad is not of such complexity to require expert testimony as to whether the warnings were sufficient. The Court notes, however, that depending on the manner in which Plaintiffs frame this matter at trial, Sunbeam may appropriately bring a motion *in limine* to limit the scope of the Plaintiffs' questioning. With that in mind, Sunbeam's motion for summary judgment is denied in this regard.

Sunbeam further asserts that it did not owe a post-sale duty to warn about reports of its products causing fires. Under Minnesota law, a continuing duty to warn of dangers associated with using a product arises only in "special cases." *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 833 (Minn. 1988). The *Hodder* court did not set forth a bright-line test for determining the nature of such special cases or when such a duty applies but rather concluded that the factors present in that case warranted imposing a post-sale duty to warn on Goodyear for its allegedly defective "K-rims." The *Hodder* court looked at the gravity of the harm occurring as a result of the alleged defect, the length of time Goodyear was aware of the danger of the K-rims, the actions Goodyear took upon learning of the dangers, Goodyear's continued advertising of tires and tubes for use with K-rims long after K-rim production was discontinued, and whether Goodyear undertook a duty to warn of K-rim dangers. 426 N.W.2d at 833. Although *Hodder* did not indicate that any of these factors was determinative, later courts have found that "continued service, communication with purchasers, or the assumption of the duty to update purchasers, are necessary elements in determining whether a post-sale

duty to warn attaches. *McDaniel v. Bieffe USA, Inc.*, 35 F. Supp. 2d 735, 741 (D. Minn. 1999) (Tunheim, J.) (citing cases). This Court agrees with that understanding of the law.

Here, the Sunbeam heating pads are mass-produced and widely distributed. It would be unreasonable to expect that a manufacturer of such products could adequately trace the owners of their products, who often purchase them anonymously, without registration, from pharmacies and discount stores. Moreover, the warnings on the heating pad warn of the risk of burns and advise consumers not to use the heating pad while sleeping. (Blanchard Aff. Ex. 1, Appendix D.) Plaintiffs have not provided any evidence, or really any argument, that additional post-sale warnings would have prevented their injuries. As a result, the Court finds that Sunbeam owed no post-sale duty to warn. Summary judgment is granted on this issue.

**IV.     Daubert Motions**

Sunbeam moves to exclude the testimony of two of Plaintiffs' expert witnesses—James J. Novak and William T. Cronenwett—pursuant to Fed. R. Evid. 702 and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Before accepting the testimony of an expert witness, the trial court is charged with a "gatekeeper" function of determining whether an opinion is based upon sound, reliable theory, or whether it constitutes rank speculation. *Id.* at 589-90. In *Daubert*, the United States Supreme Court imposed an obligation upon trial court judges to ensure that scientific testimony is not only relevant, but also reliable under the Rules of Evidence. *Id*. at 579.

The proposed expert testimony must meet three prerequisites to be admissible under Federal Rule of Evidence 702. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical or other specialized knowledge must be useful to the fact-finder in deciding the ultimate issue of fact." *Id*. "[I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001). Second, the proposed expert must be qualified. *Id*. Third, the proposed evidence must be reliable. *Id*. The proponent of the expert testimony bears the burden to prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

In determining whether the proposed expert testimony is reliable, the Court can consider: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known rate of potential error; and (4) whether the theory has been generally accepted. *Daubert*, 509 U.S. at 593-94. The purpose of these requirements "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In *Kuhmo Tire*, the Supreme Court determined, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable." *Id*. In other words, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony. *Id*. The objective of that requirement is to ensure the reliability and relevancy of expert testimony. *Id*.

The Court's focus should be on whether the testimony is grounded upon scientifically valid reasoning or methodology. *United States v. Dico, Inc.*, 266 F.3d 864, 869 (8th Cir. 2001). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001).

### A. William T. Cronenwett

Sunbeam seeks to exclude the opinions and testimony of Plaintiffs' electrical engineering expert witness, Dr. William T. Cronenwett. Specifically, Sunbeam seeks to exclude Cronenwett's opinions that the Sunbeam heating pad—and not the extension cord that the heating pad was plugged into at the time of the fire—was the cause of the fire. Sunbeam contends that Cronenwett did not use reliable methodology when he eliminated the extension cord as the cause of the fire or when he concluded that the Sunbeam heating pad caused the fire.

Sunbeam does not take issue with Cronenwett's education, qualifications, or experience, but rather it takes issue with the reliability of Cronenwett's opinions.

Sunbeam specifically challenges Cronenwett's conclusion that the heating pad overheated and was the source of the ignition of the fire, pointing to Cronenwett's deposition testimony that there was no obvious ignition source in the physical evidence of what remained of the heating pad after the fire. Sunbeam notes that up to 95% of the extension cord was not recovered after the fire and that Cronenwett acknowledged that he was unable to determine the location of all of the cords and the heating pad and how they were aligned at the time the fire started. Sunbeam asserts that Cronenwett's elimination of the extension cord as a possible source of ignition is not supported by reliable methodology. Sunbeam further contends that Cronenwett inappropriately focuses on whether other Sunbeam products have caused injury, rather than focusing his opinions on whether the Sunbeam heating pad here caused the fire in the Quist home.

Plaintiffs, on the other hand, assert that Sunbeam is merely challenging Cronenwett's conclusions because they differ from Sunbeam's own expert conclusions. Plaintiffs set forth in detail the methodology that Cronenwett used when reaching his opinion about the cause of the fire. Plaintiffs also assert that some of Cronenwett's deposition testimony has been pulled out of context.

The Court finds that Cronenwett's testimony is reliable and admissible, subject to a proper foundation being laid. Sunbeam's challenges go to the credibility, not the admissibility, of Cronenwett's testimony. Sunbeam purports to challenge the methodology that Cronenwett used in reaching his opinion that the Sunbeam heating pad caused the fire, yet Sunbeam supports this assertion by merely saying that Cronenwett could not have reached this conclusion with the evidence before him. Sunbeam's

challenge to Cronenwett's expert testimony does not describe why the methodology Cronenwett used is insufficient. Cronenwett relies on his experience and training as an electrical engineer, his experience with similar Sunbeam products, his personal examination of the fire scene and electrical evidence, and his testing and examination of x-rays of the evidence. Sunbeam does not offer any support for its proposition that Cronenwett's methodology was faulty. Further, it appears that even Sunbeam's experts could not rule out the Sunbeam heating pad as a cause of the fire. Cronenwett goes further than that to opine as to why, based on his expertise and review of the physical evidence, the condition of the electrical evidence after the fire is not consistent with the fire being caused by the extension cord. Sunbeam may challenge the credibility of Cronenwett's testimony at trial, rebut the testimony with its own witnesses, and submit its own contrary expert evidence, and the jury can determine whether the Sunbeam heating pad caused the fire. Therefore, Sunbeam's *Daubert* motion as to Cronenwett's expert testimony is denied.

    **B.    James J. Novak**

Sunbeam also seeks to exclude the opinions and testimony of Plaintiffs' expert witness James J. Novak. Specifically, Sunbeam seeks to exclude Novak's opinions as to the origin and cause of the fire at the Quists' home and Novak's opinion that the Sunbeam heating pad caused the fire, asserting that Novak did not use reliable methodology to eliminate other potential sources of the fire's ignition like the extension cord.

Plaintiffs designated Novak as a fire investigation expert in this case. Novak is a full-time shift fire investigator for the St. Paul Fire Department. He also investigates fires privately through his business, Novak Investigations. Sunbeam does not challenge Novak's qualifications but, rather, the reliability of his methodology and the admissibility of his opinions.

Sunbeam contends that Novak's opinion that the fire was not caused by the extension cord was based on Cronenwett's determination to eliminate the extension cord, not on Novak's own analysis. Sunbeam challenges Novak's testimony that he did not know that there were multiple arc points on the heating pad cord until Cronenwett told him about them. Sunbeam contends that Novak did not make his own analysis of the facts to reach this opinion to eliminate the extension cord as a source of the ignition. Further, Sunbeam asserts that Novak's methodology is faulty and not supported by the evidence in the case.

In response, Plaintiffs describe the methodology that Novak used when investigating the fire and reaching his opinion that the extension cord did not cause the ignition. Plaintiffs set forth Novak's deposition testimony regarding the arcing he observed at the fire scene inspection. Specifically, Novak testified that he saw arcing on both the extension cord and what was left of the heating pad both at the fire scene investigation and in subsequent photographs taken of the wiring. When asked, "Did you yourself make any determination to rule out the extension cord as the cause of the fire?", Novak testified:

> I looked at both the female end of the extension cord to look for any massive arcing because usually most extension cord fires are at the connections at the female receptacle or where the plug plugs in to the wall at those connections because most extension cord fires are connection fires. And I saw nothing to indicate that at either end there was any arcing activity there. And with arcing downstream in the – although there was arcing throughout the cord, arcing downstream farther away from the outlet into the line cord of the heating pad eliminated the cord as being the cause. Had the cord started the fire, it would have cut off electricity to the rest of the line downstream from the cord. So the line cord to the heater would have had any electrical activity on it.

Novak Dep. at 69-70. Acknowledging that Cronenwett had told him about that, Novak went on to describe the basis for his own opinion regarding downstream arcing. (*Id*. at 70-71.)

Similar to Sunbeam's challenge of the methodology in Cronenwett's expert testimony, Sunbeam offers no support for its opinion that Novak's methodology is inherently faulty. Sunbeam asserts that Novak's use of subsequent photographs of the fire scene evidence—rather than a personally drawn arc map—to form his opinions about arc mapping is faulty. However, Sunbeam offers no support for this assertion. Novak's methodology is adequate and his testimony admissible, subject to proper foundation being laid. Accordingly, Sunbeam's Daubert motion is denied as to the admissibility of Novak's testimony.

Thus, **IT IS HEREBY ORDERED**:

1. Sunbeam's Motion for Partial Summary Judgment (Doc. No. [17]) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

   a. To the extent Sunbeam seeks to preclude Plaintiffs from bringing a claim for property damages, Sunbeam's motion is **DENIED**;

b. To the extent Sunbeam seeks to preclude Plaintiffs' failure-to-warn claim because Plaintiffs lack expert testimony on the matter, Sunbeam's motion is **DENIED**; and

c. To the extent Sunbeam seeks summary judgment on Plaintiffs' claim for a post-sale duty to warn, Sunbeam's motion is **GRANTED**.

2. Sunbeam's Motion to Exclude the Opinions and Testimony of James J. Novak (Doc. No. [23]) is **DENIED**.

3. Sunbeam's Motion to Exclude the Opinions and Testimony of William T. Cronenwett (Doc. No. [28]) is **DENIED**.


Dated: April 22, 2010         s/Donovan W. Frank
                              DONOVAN W. FRANK
                              United States District Judge